O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FOY JAMES CHANDLER,

　　　　　　Plaintiff,

　v.

R PHILLIP GUTTIERREZ, et al.,

　　　　　　Defendants.

Case No. EDCV 14-01169-JGB-KES

MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.

## INTRODUCTION

On June 13, 2014, Plaintiff Foy James Chandler ("Plaintiff"), a former federal inmate proceeding pro se, filed the operative First Amended Complaint ("FAC" at Dkt. 37) alleging Eighth Amendment claims under Bivens v. Six Unknown Agents, 403 U.S. 388 (1971) and medical negligence claims under the Federal Tort Claims Act ("FTCA") arising out of his medical care at the Federal Correctional Institution I in Victorville, California ("FCI I Victorville"). (Id; Dkt. 138 [Plaintiff's Response to Defendants' Statement of Uncontroverted Facts] at 11, Fact 2.)

The FAC names the United States and the following five defendants who all worked at FCI I Victorville while Plaintiff was housed there:

1

1    (1) R. Philip Guttierrez was the warden;

2    (2) Louis Sterling was the Assistant Health Services Administrator ("AHSA");

3    (3) Ross Quinn, M.D., was a doctor who treated Plaintiff;

4    (4) Antonia Rogers was a physician assistant ("PA"); and

5    (5) Lourdes Singh was an after-hours nurse.

6  (Dkt. 138 at 12-13, Facts 3-8.)

7         On September 30, 2016, the United States and all five individual defendants

8  moved for summary judgment. (Dkt. 132.) In support, Defendants filed a Statement

9  of Uncontroverted Facts ("SUF") listing 70 material facts as purportedly

10 uncontroverted. (Dkt. 132-21.) Plaintiff opposed the motion by re-listing all 70 facts

11 and identifying 37 as "disputed" with cites to supporting exhibits. (Dkt. 138 at 10-

12 35, 45 [list of Plaintiff's exhibits].)

13        After several extensions, on April 28, 2017, Defendants filed a reply

14 challenging the admissibility of the declaration of Dr. David Folsom, a cardiothoracic

15 surgeon practicing in Medford, Oregon, who opines that if Plaintiff's written

16 "statement of facts" is true, then Plaintiff did not receive medical services consistent

17 with the relevant standard of care while housed at FCI I Victorville. (Dkt. 138 at 65.)

18        Because the Court finds that there are genuine disputes as to material facts,

19 Defendants' motion is DENIED.

## II.

## LEGAL STANDARD

22        "A party may move for summary judgment, identifying each claim or defense

23 — or the part of each claim or defense — on which summary judgment is sought.

24 The court shall grant summary judgment if the movant shows that there is no genuine

25 dispute as to any material fact and the movant is entitled to judgment as a matter of

26 law." Fed. R. Civ. P. 56(a). "This burden is not a light one." In re Oracle Corp. Sec.

27 Litig., 627 F.3d 376, 387 (9th Cir. 2010). The moving party, however, need not

28 disprove the opposing party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).  Rather, if the moving party satisfies this burden, the party opposing the motion must set forth specific facts, through affidavits or admissible discovery materials, showing that a genuine issue for trial exists.  Id. at 323-24; Fed. R. Civ. P. 56(c)(1).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  An issue of fact is a genuine issue if it reasonably can be resolved in favor of either party.  Id. at 250-51.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.

Local Rule 56-1 requires the moving party to file an SUF.  The SUF "shall set forth the material facts as to which the moving party contends there is no genuine dispute."  L.R. 56-1.  Properly supported facts in the SUF are assumed to be true if they are not controverted by the opposing party.  Fed. R. Civ. P. 56(c), (e); L.R. 56-1 to 56-3.

"The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury … could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict …."  Id. at 252.  A verified complaint may be used as evidence to oppose a motion for summary judgment if it is "based on personal knowledge and set forth specific facts admissible in evidence."[1]  Schroeder v. McDonald, 55 F.3d 454, 460 (9th Cir. 1995).  The Court "must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial."  MAI Sys. Corp. v. Peak

---

[1] Plaintiff verified his FAC.  (Dkt. 20 at 3, 17.)  Many of the facts set forth in the FAC concern encounters and conversations in which Plaintiff personally participated, such that he is competent to testify about them.

1 | <u>Computer, Inc.</u>, 991 F.2d 511, 516 (9th Cir. 1993).

2 | **III.**

3 | **SUMMARY OF UNDISPUTED FACTS**

4 |      Plaintiff was housed at FCI I Victorville from March 11, 2011 until July 9,

5 | 2012. (Dkt. 138 at 11, Fact 1.) The facts concerning what happened *after* his release

6 | are largely undisputed. He was driven by his family to a half-way house, the

7 | Northwest Regional Re-Entry Center ("NRRC"). (<u>Id.</u>) The NRRC's medical

8 | information intake form dated July 11, 2012, notes that Plaintiff reporting back pain

9 | upon arrival (i.e., "bad/slip disc – nerve problems") and requested an MRI. (Dkt. 138

10 | at 86 [intake form].) On July 12, 2012, NRRC sent Plaintiff to an urgent care clinic

11 | due to "unbearable/increasing back pain …." (<u>Id.</u> at 87 [staff medical notes].) In

12 | August and September 2012, the Oregon Health & Science University ("OHSU")

13 | performed an MRI of Plaintiff's spine. (<u>Id.</u> at 92 [report] and 98 [MRI image].) The

14 | radiologist who reviewed the MRI opined that it showed the space between Plaintiff's

15 | lumbar disks 3 and 4 was "destroyed," and that this "disk abnormality does not have

16 | the appearance of posttraumatic abnormality. It looks more post-infectious … but

17 | clinical correlation is advised." (<u>Id.</u> at 92.) In September 2012, Plaintiff was

18 | hospitalized at OHSU, diagnosed with vertebral osteomyelitis, a bacterial infection

19 | of his vertebrae bones, and treated for severe back pain. (Dkt. 138 at 31, Fact 58.)

20 |      The material, factual disputes in this case concern (1) when Plaintiff first

21 | contracted osteomyelitis and (2) what actions the medical staff at FCI I Victorville

22 | took, or failed to take, in response to Plaintiff's complaints of severe back pain.

23 | According to Defendants, Plaintiff was malingering and drug-seeking in prison, and

24 | all prison staff members provided him with appropriate medical care, even though

25 | they never authorized an MRI to diagnose his back pain. According to Plaintiff,

26 | "more than one doctor" at OHSU told him that if the prison medical staff had "taken

27 | just basic steps to figure out what was wrong," then they would have seen the bone

28 | infection and it could have been "easily treated" with antibiotics. (Dkt. 138 at 60; <u>id.</u>

at 98 [MRI taken at OHSU on 9/1/12].)  He contends that the late detection of his infection caused him to suffer bone damage, unnecessary pain, and kidney damage from later needing to take "such high doses of antibiotics."  (Dkt. 138 at 60.)

# IV.

# DR. FOLSOM'S EXPERT TESTIMONY

## A. Expert Testimony and California Medical Negligence Law.

The FTCA provides that the United States may be held liable for "personal injury … caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  In a case brought under the FTCA, liability is determined in accordance with the substantive law of the state where the alleged negligence occurred.  See 28 U.S.C. § 1346(b); Carlson v. Green, 446 U.S. 14, 23 (1980).

To establish a claim for medical negligence in California, plaintiffs must prove all the following elements: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence."  Hanson v. Grode, 76 Cal. App. 4th 601, 606 (1999).

The standard of care in a medical malpractice case requires "that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances."  Mann v. Cracchiolo, 38 Cal. 3d 18, 36 (1985), overruled on other grounds by Perry v. Bakewell Hawthorne, LLC, 2 Cal. 5th 536, 543 (2017).  "Because the standard of care in a medical malpractice case is a matter peculiarly within the knowledge of experts, expert testimony is required to

prove or disprove that the defendant performed in accordance with the standard of care unless the negligence is obvious to a layperson." <u>Johnson v. Superior Court</u>, 143 Cal. App. 4th 297, 305 (2006) (internal citations omitted). Physicians specializing in a medical area are "held to that standard of learning and skill normally possessed by such specialists in the same or similar locality under the same or similar circumstances." <u>Quintal v. Laurel Grove Hospital</u>, 62 Cal. 2d 154, 159-160 (1964).

In addition to the standard of care, causation must also be proven "within a reasonable medical probability based upon competent expert testimony." <u>Jones v. Ortho Pharmaceutical Corp.</u>, 163 Cal. App. 3d 396, 402-403 (1985); <u>see also</u> <u>Gotschall v. Daley</u>, 96 Cal. App. 4th 479, 484 (2002) ("[E]xpert testimony was essential to prove causation. Without testimony on causation, plaintiff failed to meet his burden on an essential element of the cause of action.")

**B.** **<u>Expert Opinions and the Federal Rules of Evidence.</u>**

In federal courts, Federal Rule of Evidence 702 governs the admissibility of expert opinions, and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The question of reliability embodied in Rule 702 is one of foundation: "whether an expert's testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" <u>Estate of Barabin v. AstenJohnson, Inc.</u>,

740 F.3d 457, 463 (9th Cir. 2014), quoting Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999).

This federal rule is comparable to California's evidentiary rule for qualifying medical experts which provides, "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." Cal. Evid. Code § 720(a); see also Keeling v. Western Auto Supply Co., 1997 U.S. App. LEXIS 30209 (9th Cir. Oct. 29, 1997) (stating Rule 702 and Cal. Evid. Code § 720 "both recognize that knowledge, skill, training, or education can qualify a witness as an expert").

Thus, while doctors must be qualified by knowledge and experience to opine on the relevant subject matter, whether they are "licensed" or have a "specialty degree" in a particular area generally goes to the weight of their testimony rather than its admissibility. United States v. Bilson, 648 F.2d 1238 (9th Cir. 1981) (affirming admissibility of psychiatrist's testimony concerning tests typically administered by psychologists); see also Payton v. Abbott Labs, 780 F.2d 147, 156 (1st Cir. 1985) ("[A] physician is qualified to give an opinion as to the mental health of someone even if he is not a psychiatrist. The fact that the physician is not a specialist in the field in which he is giving his opinion affects not the admissibility of his opinion but the weight the jury may place on it.") (citations omitted); Foster v. Enenmoh, 2013 U.S. Dist. LEXIS 108941, at *28-29 n.7 (E.D. Cal. July 31, 2013) (internist, who had no specialty in urology, was permitted to testify concerning prison's treatment of plaintiff's constipation and kidney stones).

Similarly, in Mann, a neurosurgeon who was not a radiologist was competent to testify under the California Evidence Code as to the standard of care for reviewing x-rays. Mann, 38 Cal.3d at 37. Noting that the issue was whether defendants had unreasonably failed to diagnose the plaintiff's broken neck, the California Supreme Court reasoned that it would be "unreasonable to assume that [a neurosurgeon] does

7

not regularly read X-rays and radiologists' reports and is unfamiliar with the standard of care exercised by radiologists in reading X-rays and preparing reports." <u>Id.</u> at 38. Moreover, "a neurosurgeon is obviously aware not only of the practice of his specialty but also the symptomology which leads other specialists to treat patients coming within his specialty and to refer patients to neurosurgeons." <u>Id.</u> at 38-39.

## C. <u>Defendants' Objections to Dr. Folsom's Declaration.</u>

In view of this law, Defendants supported their motion with an expert declaration and report from Dr. Paul Holtom of University of Southern California Medical Center. (Dkt. 132-1.) Dr. Holtom opined, "All of [Plaintiff's] medical visits regarding his back pain while in the prison system met the standard of care." (<u>Id.</u> at 2, ¶ 1.) He also opined that Plaintiff likely contracted osteomyelitis due to intravenous drug use in the 4-6 weeks preceding his hospitalization at OHSU, i.e., *after* leaving FCI I Victorville. (<u>Id.</u> at 3, ¶ 3.) Thus, per Dr. Holtom, nothing that the staff at FCI I Victorville did or failed to do caused or exacerbated Plaintiff's osteomyelitis-related injuries, because Plaintiff did not have osteomyelitis while at FCI I Victorville. Accepting this opinion would mean it was just a coincidence that Plaintiff repeatedly complained of disabling back pain (as opposed to knee or chest pain) while in prison and then was diagnosed with a vertebral bone infection after his release.

In opposition, Plaintiff submitted a declaration by Dr. David Folsom. (Dkt. 138 at 65.) Dr. Folsom opines that if the written "statement of facts" provided to him by Plaintiff is true, then Plaintiff did not receive medical services consistent with the standard of care while housed at FCI I Victorville. (<u>Id.</u>) Dr. Folsom is apparently referring to the "statement of facts" Plaintiff signed under penalty of perjury, which is Exhibit A to Plaintiff's opposition and immediately precedes Dr. Folsom's declaration, Exhibit B. (<u>See</u> Dkt. 138 at 45-61.) Dr. Folsom does not offer any opinions concerning when or how Plaintiff contracted osteomyelitis.

Defendants contend that Dr. Folsom's declaration is inadmissible for the

following reasons: (1) the declaration fails to disclose his educational credentials and professional experience, (2) being a cardiothoracic surgeon does not qualify him to opine on the relevant standard of care, and (3) his opinion is based on neither his review of Plaintiff's medical records nor his physical examination of Plaintiff, but instead on written facts provided by Plaintiff. (Dkt. 148 at 5.) Defendants further contend that because Dr. Folsom does not refute Dr. Holtom's onset and causation opinions, Plaintiff has failed to present sufficient evidence to demonstrate the existence of a triable issue of fact concerning causation. (Id. at 6.)

### 1. Dr. Folsom's Credentials.

While Dr. Folsom's declaration does not contain his entire educational or professional background, it does state that he is a "practicing cardiothoracic surgeon in Medford, Oregon." (Dkt. 138 at 65.) The declaration also says "contact information attached" and then includes a copy of his business card identifying him as a medical doctor and surgeon working with Asante Physician Partners. (Id.)

Plaintiff is pro se and has not yet had an opportunity to exchange expert designations or engage in expert discovery.[2] The Court assumes that, given an opportunity to augment the evidence submitted in opposition to Defendants' motion, Plaintiff would be able to provide background information for Dr. Folsom consistent with the following information from the Asante Physician Partners' website:

David Folsom, M.D., received his medical degree from the University

---

[2] This case is governed by a scheduling order that sets a cutoff date for percipient discovery, but is silent as to expert designations and expert discovery. (Dkt. 67, 89.) Typically, if the claims of a pro se inmate plaintiff survive summary judgment proceedings, then the District Judge sets a pretrial schedule including deadlines for designating experts. The District Judge also has discretion to appoint counsel who can assist with expert discovery. Here, Plaintiff was repeatedly told that his requests for pro bono counsel would be reevaluated if his claims survived summary judgment. (Dkt. 69, 84.) In his status report, Plaintiff advised that "my case will need testimony from 'expert witness' as my case deals with 'medical conditions and infectious disease' which is very confusing to me." (Dkt. 77 at 2.)

of Utah School of Medicine in Salt Lake City. He completed his residency in general surgery and fellowship in cardiothoracic surgery at Case Western Reserve University of Hospitals in Cleveland, Ohio. Dr. Folsom is board-certified in thoracic surgery.

See http://www.asante.org/find-a-doctor/find-a-doctor-profile/david-folsom/. The Court finds there is an adequate foundation that Dr. Folsom is currently a practicing cardiothoracic surgeon in Oregon.

## 2. Dr. Folsom's Qualifications to Testify Concerning the Applicable Standard of Care.

Defendants contend that even if Dr. Folsom is a cardiothoracic surgeon, that does not qualify him to testify concerning the standard of care applicable to Plaintiff's treatment, which they contend implicates specialties such as "orthopedics, internal medicine or infectious disease." Dkt. 148 at 6 n. 3.

As an initial matter, Plaintiff's allegations of negligence do not involve any specialized medical procedures. Rather, Plaintiff alleges that Defendants did not respond appropriately to his complaints of pain, erroneously dismissed his complaints as the result of malingering or drug-seeking, refused to provide him with medication unless he was physically able to attend pill call, ordered an x-ray when an MRI was indicated, and failed to authorize an MRI. (See Dkt. 37.) None of the three medical professional Defendants practiced within a specialized area of medicine when treating Plaintiff. Defendants Rogers and Singh are a physician assistant and nurse, respectively. (Dkt. 138 at 13, Facts 7-8.) Dr. Quinn is board-certified in internal medicine (id., Fact 6), but that denotes his training to provide general, primary care medical services, as he did for Plaintiff.[3] If Plaintiff had been

---

[3] Indeed, the California Medical Board's website suggests that consumers "consider a family physician or internal medicine specialist (internist)" to serve as their primary care physician. See http://www.mbc.ca.gov/Consumers/Choose_Doctor.aspx.

referred to any of these Defendants for specialized treatment in infectious diseases, for example, then Dr. Folsom might well not be qualified to opine as to the applicable standard of care. But that is not what occurred.

Dr. Folsom has a reliable basis of medical knowledge and experience relevant to Plaintiff's claims. Through his training and work as a cardiothoracic surgeon, Dr. Folsom would have acquired specialized knowledge concerning standards in the medical community for responding to patient pain complaints, managing pain, detecting drug-seeking behavior, and using x-rays and MRIs as diagnostic tools. He also would have had the opportunity to work with nurses and physician assistants, to observe their role in providing health services, and become familiar with their typical responsibilities. The Court, therefore, finds that Dr. Folsom is qualified to render the opinion in his declaration concerning the relevant standard of care.[4]

### 3. Dr. Folsom's Reliance on Plaintiff's Facts.

An expert opinion is only as reliable as the facts on which it depends. In the unique context of ruling on Defendants' summary judgment motion, however, where the evidence reveals disputed facts, the Court is obligated to accept Plaintiff's sworn version of the facts as true. <u>Torres v. City of Madera</u>, 648 F.3d 1119, 1121 n.2 (9th Cir. 2011). Dr. Folsom has essentially done the same thing. This is sufficient to show the existence of a factual dispute material to the determination of whether Plaintiff received appropriate medical care.

---

[4] Even if the Court had not considered Dr. Folsom's opinion concerning Defendants' breach of the standard of care, Dr. Holtom's opinion would not provide sufficient evidence to grant summary judgment for Defendants. Dr. Holtom merely opines, "All of [Plaintiff's] medical visits regarding his back pain while in the prison system met the standard of care." (Dkt. 132-1 at 2, ¶ 1.) One aspect of Plaintiff's claims is that on multiple occasions, he should have received a medical visit, but did not. (<u>See, e.g.</u>, Dkt. 37 at 15-16, 18-27.) Dr. Holtom's declaration and report are silent as to whether Defendants scheduled sufficient, timely medical visits for Plaintiff.

### 4. Dr. Folsom's Lack of Causation Testimony.

Defendants are correct that Dr. Folsom does not provide an opinion concerning when or how Plaintiff contracted vertebral osteomyelitis, nor does he establish his qualifications to offer such an opinion. The lack of an expert opinion on causation supporting Plaintiff's opposition, however, does not compel the Court to grant Defendants' motion, because Defendants' expert's causation opinion depends on disputed facts.

Dr. Holtom opined that Plaintiff likely contracted osteomyelitis in the 4-6 weeks preceding his hospitalization at OHSU, i.e., after leaving FCI I Victorville. (Dkt. 132-1 at 3, ¶ 3.) He based this opinion on several facts reported to him by Defendants or taken from Defendants' records, including that Plaintiff's back pain had "significantly improved" at the time of his release and that Plaintiff had admitted to intravenous drug use, a risk factor for osteomyelitis. (Id.)

These two foundational facts are disputed. First, Plaintiff calls the assertion that his back pain had significantly improved at the time of his release "totally false." (Dkt. 138 at 31, Fact 59.) Beyond his own testimony, he points to the intake records from NRRC which show he reported back pain and was sent to urgent care immediately upon his arrival (Dkt. 138 at 86-92) and the declarations of his father and sister who drove him to NRRC (id. at 81, 84). His sister observed that when she picked Plaintiff up, he complained of severe pain and had a "very difficult time sitting, standing, or even walking." (Id. at 84.) He made the trip to Oregon lying down on blankets and pillows in the back of her S.U.V. (Id.)

Second, regarding IV drug use, Dr. Holtom states that Plaintiff admitted to the Bureau of Prisons ("BOP") in 2012 that he had used intravenous drugs at an unspecified time. (Dkt. 132-1 at 3, ¶ 3c.) This may be a reference to a September 2012 BOP Health Screening Form in which Plaintiff admitted to IV drug use and sharing needles in the past. (Dkt. 132-18 at 112.) Plaintiff also tested positive for methamphetamine on September 20, 2012. (Dkt. 132-13 at 2 [BOP disciplinary

record].)  Another BOP record dated September 27, 2012, states that Plaintiff last used intravenous drugs more than 5 years earlier.  (Dkt. 138-1 at 5.)  Plaintiff responds that while he "does not deny the dirty drug test when he was out … he does deny doing any IV drug use while out of prison [in 2012]."  (Dkt. 138 at 32-33, Fact 63; id. at 31, Fact 57; Dkt. 138-1 at 94.)  It is unclear from Dr. Holtom's declaration whether his causation opinion would change if Plaintiff's only admitted IV drug use was from years ago rather than in September 2012.

Dr. Quinn and PA Rogers both submitted declarations stating that they observed indicia that Plaintiff was using IV drugs while still incarcerated at FCI I Victorville.  Dr. Quinn states that on April 13, 2012, "PA Rogers and I observed a fresh needle mark on his *left* antecubital area, the inside of his arm."  (Dkt. 132-4 at 2, ¶ 8 [emphasis added].)  PA Rogers says that on April 13, 2012, she "observed a new needle track on his *right* arm."  (Dkt. 132-5 at 3, ¶ 8 [emphasis added].)  This is not only inconsistent[5] but also disputed, because Plaintiff says, "There was never new needle track marks.  This was old scar tissue that Plaintiff still has today …."  (Dkt. 138 at 19, Fact 23.)  Plaintiff further points out that he passed prison drug tests on April 30, May 20, and June 29, 2012—during the time when Dr. Quinn and PA Rogers determined not to provide Plaintiff with additional diagnostic testing because they believed he was malingering and using drugs.  (Dkt. 138 at 37; Dkt. 138-1 at 24-25.)

This evidence sufficiently disputes the foundational facts on which Dr. Holtom relied to testify concerning when and how Plaintiff contracted osteomyelitis to create a triable issue of facts concerning causation.

---

[5] PA Rogers's notes refer to the "right ante cubital region."  (Dkt. 138 at 198.) Dr. Quinn's notes say "left antecubital area."  (Id. at 200.)

**V.**

**DISPUTED FACTS THAT PRECLUDE SUMMARY JUDGMENT**

**A. <u>Plaintiff's Claims.</u>**

The elements of Plaintiff's medical negligence claim against the United States are set out in Section IV.A, <u>supra</u>. As for Plaintiff's <u>Bivens</u> claims against the individual Defendants, to establish an Eighth Amendment claim that prison authorities provided inadequate medical care, a prisoner must allege acts or omissions constituting deliberate indifference to a serious medical need. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976). Deliberate indifference may be manifested by the intentional denial, delay, or interference with a plaintiff's medical care, or by the manner in which the medical care was provided. <u>Id.</u> at 104-05. A defendant must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994). An inadvertent failure to provide adequate medical care, mere negligence or medical malpractice, a mere delay in medical care (without more), or a difference of opinion over proper medical treatment, are all insufficient to violate the Eighth Amendment. <u>Estelle</u>, 429 U.S. at 105-07; <u>Sanchez v. Vild</u>, 891 F.2d 240, 242 (9th Cir. 1989).

As explained below, the Court finds that there are genuine disputes over facts each Defendant identified as material to Plaintiff's claims.

**B. <u>PA Rogers.</u>**

It is undisputed that Plaintiff interacted with PA Rogers on multiple occasions concerning his complaints of back pain. In general, PA Rogers contends that Plaintiff never exhibited any symptoms that merited treatment beyond what he received. In contrast, Plaintiff contends that PA Rogers never took his symptoms seriously, but instead dismissed them, and in some instances dishonestly recorded them in her treatment notes, due to her belief that he was malingering and drug-seeking.

The parties' briefing reveals multiple examples of factual disputes over the

actions of PA Rogers. On April 12, 2012, PA Rogers contends that she visited Plaintiff's cell in response to complaints that he could not walk, but she observed him complete exercises "without signs of pain." (Dkt. 138 at 16, Fact 18.) Plaintiff counters that her reported observation is false, because "at no time was Plaintiff ever not showing/feeling pain …." (Id.)

On April 13, 2012, PA Rogers observed Plaintiff shaking. (Dkt. 138 at 19, Fact 23.) She opined in her treatment notes that his shaking was likely caused by drug withdrawal, because she saw a new needle track on his arm. (Id.) As discussed above, Plaintiff disputes that he had any new needle track (on his right or left arm), and he maintains that he was shaking due to back pain. (Id.)

In treatment notes dated April 19, 2012, PA Rogers wrote that when she told Plaintiff it was "hard to believe that his back was hurting" as he claimed, "he said that he was doing Burpies and his back started to spasm after that." (Dkt. 138 at 203.) Plaintiff counters, "Plaintiff never stated it was 'burpies' that caused his back to hurt and spasm. When asked by medical staff if he exercised, his response to them was 'he did burpies for exercise.'" (Dkt. 138 at 15, Fact 15; see also id. at 27, Fact 44 [blaming Plaintiff's pain on burpies while Plaintiff says, "There was never any mention of burpies" during that encounter].) On that same day, PA Rogers observed that Plaintiff's heartrate was elevated, but concluded he "needed to calm down and learn not to get so upset" rather than crediting this as a symptom of pain. (Dkt. 138 at 203.) PA Rogers observed that Plaintiff had lost 9 pounds, but she determined no further medical intervention was needed. (Id. at 204.) She contends that she reasonably disbelieved his claim on April 12 that he was in too much pain to walk to the dining room, and she found "no medical reason that Plaintiff needed to receive meals in his cell;" he contends that his pain was obvious to a reasonable person and she was deliberately indifferent to it, dismissing him as "faking and drug-seeking." (Id. at 18 [Fact 21] and 37.) Plaintiff contends even this was a pretext, and her real motive was to discourage him from seeking care and reduce her workload, because

15

he passed multiple prison drug tests and she never referred him for drug treatment. (Id. at 37-38.)

On April 26, 2012, PA Rogers asserts that she performed a musculo-skeletal examination of Plaintiff. (Dkt. 138 at 22, Fact 32.) Plaintiff counters, "PA Rogers did not perform 'musculo-skeletal' exam as she put it. I saw her and we talked and that was all." (Id.) Plaintiff similarly disputes that he received an exam from PA Rogers on May 21, 2012, as she claims. (Id. at 28, Fact 48.)

PA Rogers noted at various times that Plaintiff was non-compliant with his medication, because he did not show up for pill call. Plaintiff counters, "he was incapacitated and his mobility so impaired that he could not physically make it to pill line" on the days he missed it. (Dkt. 138 at 15, Fact 16.)

On May 11, PA Rogers says she "observed Plaintiff standing freely while requesting a sick call form …." (Dkt. 138 at 27, Fact 45.) Plaintiff disputes this, saying that he "was never seen 'standing freely' Plaintiff was pushed to medical by cellmate and cellmate went to window to obtain sick call slip for Plaintiff." (Id.)

Regarding diagnostic testing at FCI I Victorville, it is undisputed that PA Rogers referred Plaintiff for x-rays on April 19, 2012, that were performed on May 9, 2012. (Dkt. 138 at 21, Fact 29, at 23, Fact 34, and at 90 [x-ray image].) Plaintiff contends that while having these x-rays taken, he spoke with another PA who told him that his symptoms were consistent with nerve pain, such that x-rays were unlikely to show anything and Plaintiff needed an MRI instead. (Dkt. 138 at 58.) Dr. Fernandez at FCI I Victorville reviewed two reports interpreting the x-rays, neither of which cited any abnormalities beyond Plaintiff's known scoliosis. (Dkt. 132-18 at 1732-73; Dkt. 138 at 15, Fact 14.) On June 14, 2012, Dr. Fernandez, along with PA Rogers, examined Plaintiff, and Dr. Fernandez ordered an MRI. (Id. at 59.) This exam was videotaped, but the tape has been lost, and Plaintiff disputes any

characterization of this exam by PA Rogers as showing that he was malingering.[6] (Dkt. 132-5 at 8, ¶ 29.)  FCI I Victorville's Utilization Review Committee ("URC") denied Dr. Fernandez's MRI order on June 21, 2012, by checking a box suggesting that an MRI was not medically indicated.  (Dkt. 138 at 113.)  The URC did not explain why it disagreed with Dr. Fernandez's recommendation.  (Id.)  It is unclear if the URC viewed the video or relied on information provided by PA Rogers or others to make its decision.  It is clear that because of the URC's decision, Plaintiff never received an MRI while housed at FCI I Victorville.

Thus, there are material, factual disputes over what care PA Rogers provided and what occurred when she interacted with or observed Plaintiff.

## C. Dr. Quinn.

It is undisputed that Dr. Quinn consulted with PA Rogers about Plaintiff's care and examined Plaintiff in April 2012.  (Dkt. 138 at 19, Fact 23, at 22, Fact 31.)  It is also undisputed that Dr. Quinn is a member of the URC that denied Plaintiff's medical referral for an MRI.  (Dkt. 138-1 at 32.)  There are genuine disputes, however, concerning what Dr. Quinn saw, said, and did while treating Plaintiff.

For example, Dr. Quinn claims that on April 13, 2012, he observed Plaintiff walking on his own power.  (Dkt. 138 at 19-20, Fact 25.)  Plaintiff claims Dr. Quinn

---

[6] Plaintiff contends that this videotape would have been strong evidence in support of his claims, because his appearance on the tape would have contradicted any characterizations by PA Rogers of his pain as not severe or exaggerated.  (Dkt. 138 at 28-29, Fact 51; Dkt. 138-1 at 45, RFA 16 [the parties dispute what the tape would have shown].)  It also would have allowed medical experts to consider whether subsequent actions, such as the URC's overriding Dr. Fernandez's recommendation that Plaintiff receive an MRI, were appropriate, without having to rely on PA Rogers's and Plaintiff's dueling accounts.  Plaintiff sought to obtain the tape during discovery.  First, he was told that the BOP was "not aware of any responsive video." (Dkt. 95 at 9-10, RFP 12.)  He was next told, "no records could be located responsive to your request."  (Dkt. 138 at 175.)  When he moved to compel, he was told, "the computer which may have contained the responsive recording was reported to have malfunctioned" and "the computer's hard drive was later destroyed."  (Id. at 177.)

forced him to attempt to walk under his own power, but he was unable to do so; he was only able to walk supported by Dr. Quinn and a correctional officer. (Id.) Plaintiff's cellmate witnessed this event and submitted a declaration that the correctional officer "held [Plaintiff] up." (Dkt. 138 at 70.)

As discussed above, Dr. Quinn also claims that he saw a fresh needle track on Plaintiff's arm on April 13, 2012, which Plaintiff denies. (Dkt. 138 at 19, Fact 23.)

It is undisputed that on April 13 after the exam, Dr. Quinn received a call from Plaintiff's father. (Dkt. 138-1 at 96 [Dr. Quinn's memo describing the call]; Dkt 138 at 80 [declaration by Plaintiff's father, Donald Chandler]; id. at 90 [BOP memo re interview with Mr. Chandler].) What was said during this call, however, is disputed. Dr. Quinn claims that he said that he could not give Mr. Chandler any medical information about his son and terminated the call. (Dkt. 138-1 at 96.) Mr. Chandler, however, claims that when Dr. Quinn first answered the phone and, before learning to whom he was speaking, Dr. Quinn said that Plaintiff "is a dope addict and all he wanted was drugs." (Dkt. 138-1 at 96.) Dr. Quinn ended the call after Mr. Chandler identified himself as Plaintiff's father. (Id.; see also Dkt. 138 at 187 [email apparently written by Mr. Chandler describing call].)

Plaintiff filed a Health Insurance Portability and Accountability Act ("HIPPA") grievance against Dr. Quinn because of this call, which he contends is why Dr. Quinn used his position on the URC to deny Plaintiff an MRI. (Dkt. 138 at 52.) Dr. Quinn denied that he ever told another inmate that Plaintiff had "nothing coming since he likes to write grievances." (Dkt. 138-1 at 33, RFA 12.) Plaintiff, however, contends that Dr. Quinn made such a statement to Plaintiff's cellmate. (Dkt. 138 at 52.)

**D. Warden Guttierez.**

It is undisputed that Defendant Guttierez was aware that both Plaintiff and his family had complained about the medical care Plaintiff was receiving at FCI I Victorville. Defendant Guttierez signed documents denying two of Plaintiff's

18

administrative grievances.  (Dkt. 132-3 at 2-3, ¶ 6.)  Defendant Guttierrez contends that he responded by "outlining the medical care [Plaintiff] had been provided and [telling him] that he could continue to address concerns to health services."  (Dkt. 138 at 34, Fact 67.)  Plaintiff disputes that the warden's response accurately described his medical care, and disputes that health services personnel were responsive to his concerns.  (Id.)  For example, Defendant Guttierrez's June 13, 2012, response states, "your medical record indicates that you are non-compliant with your pain medications and fail to report to Health Services as directed."  (Dkt. 20 at 28.)  Plaintiff disputes this saying, "Plaintiff was at no time willingly non-compliant with taking his medications or his follow ups with health services" but rather "he was incapacitated and his mobility so impaired that he could not physically make it to pill line/medical department."  (Dkt. 138 at 15, Fact 16.)

In addition, Plaintiff's family complained to their congressman, and Defendant Guttierrez signed the letter dated April 24, 2012, responding to the representative's inquiry.  (Dkt. 132-3 at 2, ¶ 5.)  In that letter, Defendant Guttierrez stated that Plaintiff "insists on using a wheel chair when it is evident that he can walk adequately without it."  (Dkt. 132-20.)  Plaintiff disputes that he could walk adequately without a wheelchair, at least some of the time.  (Dkt. 138 at 19, Fact 25.)  Sometimes, other inmates and staff members carried Plaintiff or transported him on a cart.  (Dkt. 138-1 at 18 [cellmate's journal].)

Defendant Guttierrez also submitted a declaration saying that he does not remember being told by Plaintiff's cellmate that Plaintiff wanted to receive meals in his cell because he was too incapacitated to walk to the dining room.  (Dkt. 132-3 at 1-2, ¶ 4.)  Guttierrez further states that had he ever been told this, he would have informed staff "so that the inmate could be immediately medically assessed …."  (Id.)  Plaintiff disputes this, saying "his declaration makes a false statement as he was personally notified by lots of people and at no time did he ever have me medically assessed …."  (Dkt. 138 at 17, Fact 20.)  Plaintiff's cellmate submitted a declaration

saying, "I approached the warden, unit manager and other staff of administration. I informed them of Mr. Chandler's problem," i.e., pain rendering him unable to leave his cell to eat or get medication. (Dkt. 138 at 68-69.) Plaintiff's cellmate's journal also says he "spoke [to] warden" on April 18, 2012. (Dkt. 138-1 at 11.) In April 2012, PA Rogers observed that Plaintiff had lost 9 pounds, potentially corroborating his claim that he was unable to leave his cell to eat. (Dkt. 138 at 204.) Thus, there are genuine factual disputes over what Defendant Guttierrez knew about Plaintiff's condition and when he knew it, and such facts are material to determining whether Guttierrez or the BOP breached any legal duties to Plaintiff.

**E. AHSA Sterling.**

Defendant Sterling is a member of the URC. (Dkt. 138 at 129.) Defendant Sterling provided a declaration stating, "I do not recall being contacted by [Plaintiff]. I would have referred a written request to me concerning medical care … to the Clinical Director, Dr. Ortiz, as I am not a medical provider." (Dkt. 132-7 at 2.) Plaintiff disputes this, claiming "Plaintiff spoke to Mr. Sterling personally and so did 2 other individuals." (Dkt. 138 at 35, Fact 69.) Plaintiff's cellmate's journal says he "talked to Sterling" on April 17, 2012. (Dkt. 138-1 at 10.) This is sufficient to create a factual dispute over what Defendant Sterling knew about Plaintiff's condition and when he knew it.

**F. Nurse Singh.**

Nurse Singh submitted a declaration saying, "I responded each time when called about Plaintiff's medical concerns …." (Dkt. 132-6 at 3, ¶ 10.) Defendants assert it is undisputed that Nurse Singh responded to Plaintiff's emergencies on May 6 and May 21, 2012. (Dkt. 138 at 25, Fact 38.)

Plaintiff disputes this, saying "Nurse Singh failed to respond at other times." (Id.) He also says, "Date of 5-21-12 … Defendant never came to assess as requested by custody staff …." (Id.) He cites to a log book prepared by prison staff that says on May 21, 2012, a staff member saw Inmate Chandler "on bed screaming" and

"contacted medical." (Dkt. 138 at 110.) The log book says, "Medical said they gave him pain medication. I asked if she would call the on-duty doctor. She replied, 'Let's see how his meds go. Have the inmate report to medical sick call in the AM.'" (Id.)

Plaintiff describes this incident saying that a correctional officer saw him in his cell "in severe pain to the point of vomiting." (Dkt. 138 at 54.) The officer notified Nurse Singh, but Nurse Singh would not come to Plaintiff's cell, so the officer "got a motorized flatbed card" and used it to transport Plaintiff to health services to see Nurse Singh. (Id. at 54, 213-14 [records reflecting gurney was used].)

Only after Plaintiff arrived at health services in this manner did Nurse Singh take his vital signs and conduct an assessment. (Dkt. 132-6 at 2-3, ¶ 8.) Only at that point did she call the on-call physician, Dr. Ortiz, who determined that a Toradol injection for pain management was appropriate. (Id.) Her declaration says, "Plaintiff reported he felt better after 15 minutes." (Id.) Her treatment notes for this incident say, "15 minutes after injection, inmate started feeling better, but did not feel strong enough to go back to his housing unit without assistance. He was sent back to his housing unit via gurney and assisted by one facility staff." (Dkt. 138 at 214.)

With regard to Nurse's Singh's lack of response on other occasions, Plaintiff claims that on May 3, 2012, he passed out in his cell trying to use the toilet. (Dkt. 138 at 56-57.) An officer contacted Nurse Singh by radio, but she failed to come, so after 15 minutes, he radioed again. (Id. at 57.) Plaintiff heard her say that he "had been in medical for 2 hours that day [where he waited for treatment and received none] and that the doctor was well aware of [his] condition." (Id.)

Plaintiff describes "another date" when "Nurse Singh was contacted by radio [and] after 10 minutes she still had not arrived." (Id. at 57-58.) When an officer went to get her, she came to his cell and told the officer that Plaintiff's pain was due to the fact that "He didn't report to medical today or come to get his medication." (Id. at 58.) She left without taking his vital signs or doing anything else. (Id.)

Plaintiff may be referring to May 23, 2012, when Defendant Singh wrote

21

Plaintiff up as "consistently non-compliant with his treatment plan" due to his failure to attend pill line. (Dkt. 138 at 216 [treatment notes].)

Alternatively, Plaintiff may be referring to May 24, 2012, when Defendant Singh documented in her treatment notes that a "friend" of Plaintiff informed her that Plaintiff "did not show up for his meds … because he was in too much pain to get out of bed …." (Dkt. 138 at 217.) Her response to the friend was "to tell [Plaintiff] to come back tomorrow during sick call for [follow up] with his PCP ["primary care provider" PA Rogers]." (Id.) The following day, PA Rogers noted that Plaintiff's cellmate told her Plaintiff "could not make it to pill line," but she responded that she "needed to see him" and he needed to "come to medical" in order to do so. (Id. at 218.) Thus, per Plaintiff's version of events, Plaintiff was caught in an unenviable Catch-22; he needed medical attention, but he could only get medical attention if he was well enough to go see the providers.

As of May 24, 2012, Plaintiff had "alerts" in his BOP medical file that he "claims false injuries and pain" and "demands improper meds" such as Toradol due to "contrived behavior pain issues." (Dkt. 138-1 at 5.) It is unclear if Nurse Singh authored these alerts, but they apparently influenced Plaintiff's subsequent treatment, including perhaps the URC's decision that he did not need an MRI.

Thus, there is a dispute of fact concerning what Defendant Singh did in response to Plaintiff's complaints that he was experiencing debilitating pain.

**G. Qualified Immunity.**

The individual Defendants argue that they are entitled to qualified immunity. (Dkt. 132 at 28-31.) The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

Viewing the evidence in the light most favorable to Plaintiff, he has raised a

genuine dispute of material fact as to whether the individual Defendants violated Plaintiff's constitutional right to adequate medical care, and that right was clearly established at the time of the alleged violations.  See Pearson, 555 U.S. at 232 (setting out two-part test for qualified immunity claims); Clement v. Gomez, 298 F.3d 898, 906 (9th Cir. 2002) (explaining that the right to be free from officers intentionally denying or delaying access to medical care was clearly established); McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) (deliberate indifference may be established if defendant "purposefully ignore[s] or fail[s] to respond to a prisoner's pain or possible medical need"), overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

## VI.

## CONCLUSION

Because there exists a dispute of material fact concerning each of the moving Defendants, Defendants' motion for summary judgement is DENIED.  This case will be referred to District Judge Jesus Bernal to set a trial date.


Dated:  May 05, 2017

_____
KAREN E. SCOTT
United States Magistrate Judge